IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 24-10482-J

_____

ON APPEAL FROM
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

UNITED STATES OF AMERICA,

*Plaintiff / Appellee*,

v.

JAVIER HERNANDEZ,

*Defendant / Appellant.*

_____

APPELLANT HERNANDEZ'S INITIAL BRIEF

_____

Martin A. Feigenbaum, Esq.
Attorney for Defendant/Appellant Hernandez
P.O. Box 545960
Surfside, Florida 33154
Telephone: (305) 323-4595
Facsimile: (844) 274-0862
Email: innering@aol.com

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, appellant Javier Hernandez hereby certifies that the following persons and/or entities may have an interest in the outcome of this direct appeal:

1. Ramon Reyes Aranda (co-defendant).

2. The Honorable Beth Bloom (United States District Judge).

3. Brian Dobbins, AUSA (trial attorney for Plaintiff/Appellee United States of America).

4. Arielle Klepach, AUSA (trial attorney for Plaintiff/Appellee United States of America).

5. Markenzy Lapointe (U.S. Attorney for the Southern District of Florida).

7. Daniel Matzkin, AUSA (Chief, Appellate Division, United States Attorney's Office for the Southern District of Florida).

8. Bijan Parwaresch, Esq. (attorney for co-defendant Reyes).

9. Ignacio J. Vazquez, Jr., AUSA (trial attorney for Plaintiff).

The undersigned certifies that no publicly-traded company or corporation has an interest in the outcome of this case.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant/Appellant Javier Hernandez believes that oral argument greatly would assist this Court's decision-making process because this case involves multiple complex issues as well as one which appears to be of first impression in this Circuit relating to warrantless cell phone searches.

## STATEMENT OF TYPE SIZE AND STYLE

The type size used in this Initial Brief is 14-point. The style used is Times New Roman Regular.

## STATEMENT OF APPEAL PREFERENCE

This appeal is entitled to preference because it is a criminal case in which Defendant/Appellant Javier Hernandez was convicted and is serving a term of imprisonment of ninety-five months in the Federal Bureau of Prisons.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons.............................................................C-1

Statement Regarding Oral Argument..........................................................i

Statement Regarding Type Size and Style....................................................i

Statement of Appeal Preference................................................................i

Table of Contents..................................................................................ii

Table of Citations................................................................................iii

Statement of Subject-Matter and Appellate Jurisdiction............................v

Statement of the Issues..........................................................................1

Statement of the Case............................................................................2

Summary of the Argument.....................................................................26

Argument and Citations of Authority......................................................27

   I. The Judge Erred By Denying The Motion To Suppress The Phone
Evidence Because: A) Running The Extraction Software Is The "Search"; B) A
Warrant Is Required To Conduct A Phone Search; C) The Government Did Not
Obtain A New Warrant To Conduct A Second Search After The Warrant Expired;
And D) The Government Depended On The Illegal Search To Prove Its Case......27

   II. The Judge Erred By Denying Hernandez's Rule 29 Motion Because The
Government Did Not Meet Its Burden Of Proof To Sustain Convictions For Any
Of The Five Counts................................................................................39

III. The Judge Erred When She Denied The Objections To Guidelines
Aggravating Factors Resulting In An Erroneous Total Offense Level...................49

Conclusion....................................................................................................56

Certificate of Service.....................................................................................58

Certificates of Compliance.............................................................................58

## TABLE OF CITATIONS

Page

CASES

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).....................................................51

*Riley v. California*, 573 U.S. 373 (2014)....................................................32

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022)................................51

*United States v. Barrington*, 648 F.3d 1178 (11th Cir. 2011).................26

*United States v. Bautista-Villareal*, 2023 WL 4363995 (11th Cir. 7/6/23).............51

*United States v. Carrington*, 700 F. App'x 224 (4th Cir. 2017).............36

*United States v. Cleveland*, 907 F.3d 423 (6th Cir. 2018)................37, 38

*United States v. Cubero*, 754 F.3d 888 (11th Cir. 2014)........................26

*United States v. Diaz-Lizaraza*, 981 F.2d 1216 (11th Cir. 1993)...........25

*United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023)..................51, 53

*United States v. Garcia*, 718 F.2d 1528 (11th Cir. 1983).......................28

*United States v. Gonzalez*, 183 F.3d 1315 (11th Cir. 1999)...................................43

*United States v. Jenkins*, 779 F.2d 606 (11th Cir. 1986)........................................44

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990)..........................................26

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989)......................................44, 45

*United States v. Lawrence*, 47 F.3d 1559 (11th Cir. 1995).........................50-54, 56

*United States v. Moore*, 504 F.3d 1345 (11th Cir. 2007)....................40, 41, 43, 46

*United States v.* Rodriguez, 732 F.3d 1299 (11th Cir. 2013)...........................52, 53

*United States v. Washington*, 714 F.3d 1358 (11th Cir. 2013).........................52, 56

*United States v. Watson*, 2024 WL 3860113 (11th Cir. 8/19/24)..........................33

*United States v. Whipple*, 92 F.4th 605 (6th Cir. 2024)..........................................38

*Wong Sun v. United States*, 371 U.S. 471 (1963).......................................29, 35, 38

## STATUTES

18 U.S.C. §371...............................................................................................2, 45

18 U.S.C. §1324()(1)(A)(v)(I)........................................................................2, 39

18 U.S.C. §1956(h)....................................................................................2, 47, 56

18 U.S.C. §2321.............................................................................................2, 45

## RULES

Fed. R. Crim. P. 29.................................................................................26, 39, 48

Fed. R. Crim. P. 41(e)(2)(A)(B)..........................................................................34-36

iv

SENTENCING GUIDELINES

U.S.S.G.§ 2B1.1(b)(1)(I)..............................................................................51

U.S.S.G. §2L1.1(b)(6)..................................................................................54

U.S.S.G. §3B1.3...........................................................................................55

U.S.S.G. §4C1.1...........................................................................................50

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction over this cause pursuant to 18 U.S.C. §3231 because appellant was charged with an offense against the laws of the United States of America. This Honorable Court has appellate jurisdiction over this cause, pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742, which give a United States Court of Appeals jurisdiction over all final decisions and sentences of the district courts of the United States of America. On February 9, 2024, the district court filed the final judgment of conviction and sentence which disposed of all the parties' claims. On February 14, 2024, the appellant filed a timely notice of appeal to this Court from that final judgment.

## STATEMENT OF THE ISSUES

I. WHETHER THE JUDGE ERRED BY DENYING HERNANDEZ'S MOTION TO SUPPRESS CELL PHONE EVIDENCE WHERE: A) THE GOVERNMENT DID NOT OBTAIN A WARRANT TO SEARCH HIS CELL PHONE A SECOND TIME; B) THE FIRST WARRANT HAD EXPIRED MORE THAN A YEAR EARLIER; C) THE SECOND SEARCH USED DIFFERENT SOFTWARE TO COPY DATA NOT FOUND DURING THE ORIGINAL SEARCH; AND D) THE GOVERNMENT DEPENDED ON THE FRUITS OF THE WARRANTLESS SEARCH TO PROVE HERNANDEZ'S GUILT..

II. WHETHER THE JUDGE ERRED BY DENYING HERNANDEZ'S RULE 29 MOTIONS WHERE THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN CONVICTIONS UNDER ANY COUNT.

III. WHETHER THE JUDGE ERRED WHEN SHE CALCULATED THE SENTENCING GUIDELINES DENYING HERNANDEZ'S OBJECTIONS TO UNWARRANTED AGGRAVATING FACTORS.

**STATEMENT OF THE CASE AND FACTS**

**A. Course Of Proceedings And Disposition In the Lower Tribunal.**

On November 16, 2022, the Government secured an indictment against

Javier Hernandez ("Hernandez") and Ramon Reyes Aranda ("Reyes").  DE3[1].  The

indictment had two counts: count 1-conspiracy to encourage aliens to enter the

United States for financial gain, 8 U.S.C. §1324(a)(1)(A)(v)(I) (Hernandez only);

count 2, conspiracy to transport stolen vessels, 18 U.S.C. §371 (both defendants).

On March 23, 2023, the Government obtained a superseding indictment ("SI")

adding three more counts against Hernandez and one against Reyes.  DE51. As to

Hernandez: count 3-conspiracy to traffic in certain motor vehicles, to export a

motor vehicle with a tampered identification number, and to alter motor vehicle

identification numbers, 18 U.S.C. §371; count 4-trafficking in certain motor

vehicles, 18 U.S.C. §2321; and as to both Hernandez and Reyes, count 5-money

laundering conspiracy, 18 U.S.C. §1956(h).  The Judge set a September 25, 2023

trial date.  DE71; DE72.  On July 21, 2023, Hernandez filed a notice of expert as to

Daniel P. Riemer ("Riemer").  DE83.

---

[1] In this initial brief, Hernandez references the record below by "DE" and the docket number followed by a colon and page number(s).  Government trial exhibits are referenced by "GX" and defense exhibits by "DX" followed by their numbers or letters.  Plaintiff/Appellee United States of America is abbreviated as "the Government," and The Honorable Beth Bloom as "the Judge."

On August 3, 2023, Hernandez filed a notice of digital forensic expert Thomas Pullen ("Pullen"). DE89. On August 21, 2023, Hernandez filed a motion to suppress evidence ("MTS")[DE102] the FBI had extracted from his cell phone (the "Phone"). On September 11, 2023, the Government filed a response in opposition to the MTS. DE122. On September 13, 2023, Hernandez filed a reply to the response to his MTS. DE124. On September 19, 2023, the Judge entered an Order denying the MTS. DE136. On September 26, 2023, first day of trial, Reyes pled guilty before jury selection. DE148; DE149; DE150.

After jury selection and openings, the Government called two witnesses, Cuban migrants Esthalin Benitez Castillo ("Benitez") and Jose Carlos Martinez Alfonso ("Martinez"). DE239. On day 2 of the trial, September 27, 2023, the Government called expert Evan Sanborn ("Sanborn"), United States Coast Guard ("USCG"), and Mario Almanza Vazquez ("Almanza"), Juan Mendoza Moo ("Mendoza"), and Angel Isaias Seca Matus ("Seca"), all State of Yucatan, Mexico police officers. DE240. On day 3, September 28, 2023, FBI agents Gabriel Rose ("Rose") and Aaron Spielvogel ("Spielvogel") testified. DE241. On September 29, 2023, day 4, the Government finished Spielvogel's testimony and called police officers Hans "Ed" Gullekson ("Gullekson") and Stacey Walker ("Walker"), and

Reynaldo Crespo Marquez ("Crespo"), a defendant in *United States v. Gonzalez Vidal et al.*, Case No. 21-20050-CR-CMA (S.D. Fla.)("GV Case").  DE164; 242.[2]

On September 30, 2023, Hernandez filed a motion for reconsideration ("MFR") of the denial of his MTS.  DE157.  On October 1, 2023, the Government responded to the MFR, and Hernandez replied.  DE159;DE160.  On October 2, 2023, the Judge denied the MFR.  DE163.  On day 5, October 2, 2023, the witnesses were Marco Island police officer Joshua Ferris ("Ferris"), contractor Bart Drake ("Drake"), property manager William Sheehan ("Sheehan"), boat owner John Wiesner ("Wiesner"), Yamaha engine field service manager Jim Johnson ("Johnson"), FBI digital forensic experts Richard Soto ("Soto"), Arturo Ortega ("Ortega"), and Christopher Goodrich ("Goodrich"), and Customs and Border Protection Officer Stephen Farlow ("Farlow").  DE243.  On October 4, 2023, day 6, boat owner Robert Maytum ("Maytum") and Reyes testified.  DE244.

On day 7, October 6, 2023, Reyes completed his testimony followed by boat owners John Teteris ("Teteris") and Robert Mauceli ("Mauceli"), law professor Keith Rosenn ("Prof. Rosenn"), and Roberto Marrero Cisneros ("Marrero"), a convicted felon in various federal and state cases.  DE245.  On October 10, 2023, day 8, Marrero completed his testimony, defense digital forensic

---

[2] The human smuggling organization in the GV Case is referred to as the "GV HSO," and its lead defendant, Jose Miguel Gonzalez Vidal, as "Gonzalez."

expert Pullen testified out-of-turn followed by FBI case agent, Sergio Francisco ("Francisco"). DE246. On October 11, 2023, day 9, Francisco finished his testimony, and the Government rested. DE238. Hernandez moved for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29, on all counts. The Judge reserved ruling on that motion. DE238:169-170.

The defense presented its case, first calling Riemer, whom the Judge admitted as an expert witness for law enforcement and maritime issues. DE247. On day 10, October 16, 2023, Riemer completed his testimony, and then Hernandez took the stand. DE248. On October 17, 2023, day 11, Hernandez finished his testimony, and the defense rested. DE238. Pursuant to Rule 29, the defense renewed its motion for a judgment of acquittal on all counts. DE238:144-48. On day 12, October 18, 2023, the Judge charged the jury, the parties gave their closing arguments, and the jury deliberated and returned a guilty verdict later that day as to all counts. DE249. On February 2 and 9, 2024, the Judge conducted sentencing hearings. DE250; DE251.

On October 31, 2023, Hernandez filed a Rule 29 motion ("PTR29") and a motion for new trial ("MNT"). DE196; DE197. On November 14, 2023, the Government filed responses to the PTR 29 and MNT. DE198; DE199. On November 19, 2023, Hernandez filed replies to those responses. DE201; DE202.

On December 4, 2023, the USPO issued the Presentence Investigation Report ("PSR"). DE204. On December 14, 2023, Hernandez filed Objections to the PSR. DE208. On December 15, 2023, the Judge sentenced Reyes to twenty-eight months imprisonment as to count 5 and three years supervised release. DE209; DE211. On December 15, 2023, the Judge denied the PTR29 and MNT. DE210.

On December 19, 2023, the Government filed objections to the PSR. DE212. On January 23, 2024, Hernandez filed a sentencing memorandum. DE214. On January 26, 2024, the USPO issued a revised PSR and Addendum. DE219; DE219-1. On January 31, 2024, Hernandez filed Objections to it, and on February 1, 2024, the Government responded to those Objections. DE222; DE223. On February 2, 2024, the Judge conducted a sentencing hearing and decided on a guidelines total. DE250. On February 9, 2024, the Judge held a second sentencing hearing and entered judgment of 95 months imprisonment as to counts 1, 4, and 5, and 60 months as to counts 2 and 3, all terms to run concurrently with three years of supervised release. DE226; DE251. On February 12, 2024, the USPO issued a final revised PSR. DE227. On February 14, 2024, Hernandez filed a timely notice of appeal. DE228.

The Government called twenty-seven witnesses during its case in chief.

Four had some contact with Hernandez: Yucatan police officer Almanza and

convicted felons Crespo, Reyes, and Marrero.  Nine were law enforcement officers

who had no contact with Hernandez during relevant times but later were involved

in matters related to the case.  Five witnesses were admitted as experts.  Owners of

the four boats listed in count 2, and two individuals who discovered the boats

missing, took the stand.  Hernandez called two experts, Riemer and Pullen, and

testified himself.

## 1. Migrant Witnesses.

The first two witnesses, Benitez and Martinez, were Cuban migrants whom

the GV HSO transported by boat to Yucatan, Mexico.  DE239:134-201.  Benitez

left Cuba with other migrants on January 4, 2019 and arrived in Merida two days

later.  DE239:137-38.  He was taken to a house and kept there until his relatives

paid a $10,000 smuggling fee.  GV HSO members beat some migrants who did not

timely pay their fees and sent videos to their families and at times threatened to kill

them.  Benitez finally was released and made his way to the U.S.  DE239:141-45;

154-57.  Martinez was smuggled from Cuba to Merida in May 2018 and taken to a

large house called "La Finca" which had a big yard and a pool.  Martinez was told,

if his family didn't pay the smuggling fee, he would be killed. Because payment was not made right away, they took Martinez to another location where he was beaten. His family paid his debt, and he made his way to the U.S. DE239:167-68, 189, 193-95. The Government did not ask these witnesses about Hernandez and, in fact, his name was not even mentioned. DE239:134-201.

## 2. Yucatan, Mexico Police Officers.

In the early hours of November 21, 2019, in Progreso, Yucatan, Mexico, Almanza encountered Hernandez on the street. He checked his Florida driver license. Hernandez told Almanza he arrived in Mexico by boat. Almanza arrested him for not entering Mexico legally and possessing marijuana, and he seized Hernandez's cell phone (the "Phone"). DE240:59-98. On November 22, 2019, Mendoza encountered Mario Alberto Enrique Lopez ("Neco") towing a boat near his "Akumal" marina. Mendoza arrested Neco, seized the boat, and towed to a police lot. DE240:104-118. On December 2, 2020, Seca conducted a traffic stop involving Gonzalez and seized his cell phones. *Id*. at 125-138.

## 3. Lead Case Agents.

The original lead case agent was Spielvogel and his replacement Francisco. The former testified he became aware of Hernandez in November 2019 when Yucatan police notified him about the seizure of a boat Hernandez had delivered to

Neco, a target in a stolen vessel ring the FBI was investigating. He and another agent went to Yucatan in mid-December 2019 and confirmed with Naples police the boat was the one reported stolen a few weeks before. Yucatan police gave Spielvogel the Phone [GX3] seized from Hernandez. DE241:32-36, 41. On February 27, 2020, pursuant to a warrant, the FBI conducted a search of the Phone and copied the information it found. The software the FBI used could not extract WhatsApp data and certain other data. DE241:46-48. On April 6, 2021, thirteen months after the warrant's March 10, 2020 expiration, the FBI conducted a warrantless search of the Phone and discovered a mountain of WhatsApp and other data not copied on February 27, 2020. Armed with the voluminous information from the warrantless April 6, 2021 Phone search, including WhatsApp texts, chats, audio files, photographs, and search histories, and new data, the FBI began an investigation of Hernandez between April 2021 and April 2022.[3] DE241:49-54.

On April 18, 2022, Spielvogel and another agent went to Hernandez's residence and asked for a voluntary interview, and he consented. The agents gave Hernandez a target letter, read his *Miranda* rights, and showed him a PowerPoint presentation [GX108]: WhatsApp messages and images from the warrantless Phone search, including exchanges between him and Reyes and Neco, that

---

[3] About sixty, or around one-half of all Government trial exhibits were obtained from the warrantless Phone search. *See* DE184:1-3.

implicated him in the transport of stolen boats to Mexico. *Id*. at 59-67. Hernandez

did not deny he drove boats and cars from Florida to Mexico for Neco and others.

*Id*. at 75. However, he denied being involved with the GV HSO. Hernandez knew

Gonzalez was in the migrant smuggling business, and that Gonzalez had a

relationship with Neco to get boats from him for that purpose. He admitted

visiting "La Finca." However, he denied having personal knowledge migrants

were being threatened and abused. DE241:95-97, 112-13.[4]

On cross-examination, Spielvogel said Hernandez returned to the U.S. from

Mexico in late December 2019. In late November 2019, the FBI identified

Hernandez as the person who delivered Neco the last boat in the SI reported stolen

from Marco Island earlier that month. Yet, nobody ever contacted Hernandez

about that theft until the FBI interviewed him on April 18, 2022, more than two

years after his return to Florida on December 25, 2019. DE241:137-38. On

February 26, 2020, Spielvogel obtained a warrant to search the Phone which had to

be executed by March 10, 2020. The FBI conducted the search on February 27,

---

[4] At one point the prosecutor asked whether Hernandez admitted to driving "stolen" boats and cars to Mexico. Her phrasing was ambiguous. She did not ask Spielvogel whether Hernandez stole boats or vehicles or had personal knowledge they were stolen. DE241:112-13. In fact, in his earlier testimony, Spielvogel stated Hernandez did not believe the boats he drove to Mexico were stolen from their owners. DE241:99-100. There was no physical evidence that any vehicles Hernandez drove to Mexico were stolen.

2020.  On April 6, 2021, thirteen months later without a warrant, it conducted

another Phone search.  Spielvogel thought the second search was allowed because

"we considered that a continuation of the same search."  DE242:24-26.  Yet, he

agreed the warrant had a deadline after which the Phone could not be searched.  *Id*.

at 28.  He said that, like a search warrant for a house, once a warrant expires no

search of the property can be done without obtaining a new warrant.  At that point,

cross-examination ended with the defense reserving a motion.  *Id*. at 30-32.

On redirect examination, the prosecutor asked: "Is it fair to say that the

evidence of Mr. Hernandez's theft of those vessels came primarily from his cell

phone?"  Spielvogel answered: "The majority of the evidence was derived from his

cell phone that led to our investigation."  *Id*. at 35.  The prosecutor attempted to

establish the warrant permitted additional Phone searches after the warrant's March

10, 2020 expiration.  *Id*. at 40-44.  Spielvogel asked to review the warrant, and the

prosecutor directed his attention to three paragraphs of the affidavit.  He thought

the section she was referring to was "Paragraph B, Nature of the Examination."

However, he never recited what language authorized the FBI to conduct a new

Phone search thirteen months later.  Nor did the prosecutor seek admission of the

February 26, 2020 warrant and warned Spielvogel "to not read from it."  Therefore,

any provision in the warrant purportedly authorizing the April 6, 2021 search of the Phone never became part of the trial record. DE242:43-44.

In mid-2022 Francisco became case agent when Spielvogel transferred to another FBI office. The FBI was preparing for trial in the GV Case and working on Hernandez's indictment. The FBI had collected a lot of evidence mostly from the Phone and two Gonzalez phones. It also had historical cell site data to try and link Hernandez's travels at times material to four boat thefts. DE246:106-09. The FBI relied on Cellebrite reports made after copying the Phone's contents from the April 6, 2021 warrantless search. *Id*. at 115-117. When the Government sought admission of a Device report (GX16), the defense stated: "based on the previous rulings of the Court," it wanted to "preserve [its] prior objections." The Judge said: "Certainly. And I'll give you a continuing objection." DE246:119-120. The Government moved into evidence more Cellebrite reports from the April 6, 2021 warrantless search. *Id*. at 122-24; *see* DE184:3 (GX12 through GX17).

Francisco gave lengthy testimony with information from the Cellebrite reports, such as Google Chrome searches, vehicle VINs, keys for Yamaha marine engines, boat brands like some reported stolen, and a Merida hotel where passport fraud would take place. *Id*. at 132-137. Franscisco went over WhatsApp chats between Hernandez and Neco he claimed were linked to the SI's fourth stolen boat.

*Id*. at 186-89.[5] He also reviewed chats between Hernandez and Yisel Castro to try and show Hernandez's participation in the count 1 conspiracy. DE246:189-198. In his testimony the next day, Francisco went over WhatsApp chats and audio recordings between Hernandez and Gonzalez[6]. DE247:16-38, 40-45; GX8, 8A. Francisco discussed WhatsApp chats between Hernandez and a seller of fuel containers and between Hernandez and forger Marrero. *Id*. at 45-52; GX9, 9A-9D; GX11, 11A. Francisco showed a photo of a temporary license plate and a Cellebrite report (GX100, p. 68) he tied it to Marrero's message about a Toyota Tundra truck ("Tundra") Hernandez drove from Miami to Neco. *Id*. at 110.

On cross-examination, Francisco admitted he did not have proof the Tundra Hernandez drove to Mexico was stolen but rather was making an "educated guess." *Id*. at 124. Francisco did not know the reason why Hernandez sent money via

---

[5] Information relating Neco, owner of the Akumal marina in Progreso, came up frequently during trial. The Government said Neco was involved in "many phases" of GV HSO operations. DE246:140. To try and prove Hernandez's guilt, the Government relied heavily on information obtained from the April 6, 2021 warrantless Phone search. *See*, *e.g.*, DE246:140-165, 172-183, 186-89. In an abundance of caution, to preserve the record regarding denial of his MTS, Hernandez again objected to admission of Phone evidence as illegal fruits from the April 6, 2021 warrantless search. DE246:143.

[6] The defense renewed its continuing objection to Cellebrite evidence from the warrantless Phone search. The Judge said she would "grant [the defense] a continuing objection with regard to...the Cellebrite issue." DE247:17. The defense raised this objection shortly thereafter specifically as to the Hernandez-Gonzalez audio files. *Id*. at 21; GX8B-8Z5.

Western Union on one occasion to Gonzalez and Crespo. Regarding Hernandez's travel records, Francisco agreed "the mere fact of travel" was "not evidence of the commission of any crime in this case." *Id*. at 147-48. On redirect Francisco recounted how Reyes lied during his debrief the Saturday before trial about a Cobia boat. Reyes first said he bought it but, after being challenged by the agents, he admitted stealing it. *Id*. at 163-64.

<u>4. Co-Defendant Reyes.</u>

On September 26, 2023, the first day of trial, Reyes pled guilty before jury selection. DE150; DE244:23-36. On October 4 and 6, 2023, he testified as a Government witness. Reyes lived in Naples and worked as a truck driver and electrician. Neco and Gonzalez asked Reyes to steal a Grady-White brand boat. After the theft they needed someone to drive it to Mexico. Gonzalez learned through family that Hernandez could do that job and told Reyes how to get in touch with him. DE244:21, 43-44, 49-50. Reyes did not tell him the boat was stolen. After it got to Mexico, Reyes learned the boat was being painted so Gonzalez and Neco could sell it. *Id*. at 53-54. Neco told Reyes to find more boats in good condition with Yamaha engines. Reyes began looking for them at unoccupied houses on canals with no surveillance cameras. There was no evidence that Hernandez went with Reyes on those scouting trips. *Id*. at 56-59. Reyes said

he stole around twenty-one boats.  Neco put Reyes in touch with Marrero who made false documents for boats, but Reyes never said Hernandez had knowledge of any false documents.

Reyes understood that the boats Hernandez drove to Neco's marina were painted and sold.  DE245:25-26.  Reyes never stated the boats he stole, and that Hernandez drove to Mexico, were used to smuggle migrants, bribe officials, or sell to finance criminal activity.  DE244:21-73.[7]  Reyes's role was to find boats, send their photos to Neco and, if Neco wanted a boat stolen[8], obtain the key number, and notify Hernandez a boat was ready to drive to Mexico.  *Id*. at 99.  The prosecutor went over portions of the Cellebrite reports of chats and audio files related to Reyes and Hernandez.  *Id*. at 101-136; GX7, 7A-D.

On cross-examination, Reyes admitted he lied to prosecutors during his debrief the Saturday before trial started.  DE244:141-44, 154.  Reyes had a cousin who lived in Yucatan[9] who in 2017 introduced him to a convicted boat thief, "El

---

[7] Reyes did not know whether Hernandez "held" money for Neco in the U.S. or whether Gonzalez, Neco, or others might be committing crimes other than selling stolen boats.  DE244:136-37; DE245:32.

[8] During Reyes's direct examination, the prosecutor would lead him by inserting the phrase "you *and Javier*" when asking Reyes about "the boats *he*, Reyes, stole."  *See*, *e.g*., DE244:71-72.

[9] Francisco testified that Reyes's cousin had some outstanding warrants from Tampa relating to "transport of stolen property."  DE247:135-36.

Gordo," who stole the Grady-White boat with Reyes and later introduced Reyes to Neco. Reyes said he "*gave* [Hernandez], not just one, but *several*, boats to drive to Mexico..." DE245:17 (emphasis supplied). He sent Hernandez photos of some boats not stolen or taken to Mexico. *Id*. at 20. Reyes could not find any messages he sent to Hernandez with an engine key serial number corresponding to a boat that either was stolen or driven to Mexico. DE245:21-22.

## 5. Crespo And Marrero.

The Government called two other convicted felons, Crespo and Marrero, to testify. A defendant in the GV Case, Crespo recently pled guilty to RICO and other charges and was facing twenty-five years imprisonment. In 2007 he got involved in alien smuggling bringing twenty-five Cubans to the U.S., made $60,000, and bought his own boat. In 2008 he got charged in a federal case, pled guilty, but fled before sentencing. Crespo was a fugitive for eleven years in Mexico where he continued doing Cuban migrant smuggling. From there he went to Cuba where he was convicted of a smuggling offense and sentenced to twelve years. Crespo spent six years in a Cuban prison and after his release returned to Mexico. In 2021, Crespo was indicted in the GV Case, extradited to Miami, pled guilty to

RICO and smuggling charges and, at the time of Hernandez's trial, was awaiting sentencing in that case.[10] DE242:98-106; GX69.

Neco let the GV HSO use his marina and provided it with boats and fuel. Crespo described how the organization would sell boats, boat engines and parts, and vehicles. He said Reyes would steal the boats, and Hernandez would take them to Mexico. DE242:116-129. Crespo met Hernandez on December 24, 2017 when the latter drove the Grady-White boat to Mexico. Crespo said Hernandez brought ten to twelve boats to Mexico, and Neco paid him $10,000 for each trip. After boats arrived in Mexico, the GV HSO would ask "Ramon" in Miami to provide false titles, registrations, and identification numbers. Stolen boats were either sold, kept for personal use, or given as gifts. *Id*. at 130-35. Neco paid Hernandez in cash when he was in Mexico and sometimes gave him other money to pay people in Miami. Crespo also said Hernandez drove six or seven stolen vehicles to Mexico which either were for personal use, sold, or given as gifts.[11] *Id*. at 139-145. Hernandez visited "La Finca" which was "a nice place." Crespo said Hernandez knew about GV HSO business. DE242:145-149.

---

[10] After he was extradited to Miami, Crespo finally was sentenced to 152 months prison for his 2008 conviction in that smuggling case. DE242:105.

[11] Although Crespo described some of the vehicles, there was no proof any of these vehicles were stolen. DE242:144.

On cross-examination Crespo admitted beating some migrants who had not paid their fees. He changed his earlier testimony that Hernandez "knew" the boats were stolen to he "assumed" Hernandez knew the boats were stolen. DE242:150-158. Crespo also told prosecutors the GV HSO worked with Florida boat owners who wanted their boats stolen so they could make insurance claims, but that Hernandez never drove any of those boats. *Id*. at 159-160.

In 1989 Marrero came to the United States from Cuba. He was serving a five-year sentence in the BOP for conspiracy to export stolen boat parts and making false identification numbers for boats and motor vehicles. He had state court convictions a federal case pending in Tampa for making false VINs. DE245: 88-96; GX70. Marrero said Hernandez would drive cars to Gonzalez in Mexico on which Marrero had installed false VINs. *Id*. at 96. As to boat documents and HINs (hull id numbers), Marrero would make those too but would send them directly to the GV HSO in Mexico. *Id*. at 99-100. Hernandez told Marrero he had to go see Reyes to take a boat to Mexico. Marrero recalled making false documents for Reyes for his Cobia boat. He didn't know if false HINs he made were for any boats Hernandez took to Mexico. *Id*. at 105-06; DE246:37.

Marrero didn't know if any boats Hernandez drove to Mexico were stolen but, over defense objections for lack of foundation and personal knowledge, he

answered: "I didn't see it physically, but he told me so."  DE245:106-07.  The

prosecutor used a Phone report to go over messages between him and Hernandez.

One message showed Hernandez's driver license because he needed a temporary

plate for the Tundra.[12]  *Id*. at 109-122; GX11, 11A.  However, he did not need a

false temporary plate because Hernandez was registering the Tundra in his own

name.  Marrero installed false a VIN on the Tundra but never said Hernandez knew

about it.  DE246:9-11.  Marrero agreed that, by registering the Tundra in his own

name, Hernandez's personal information would become part of Florida's motor

vehicle records.  DE246:24-26.  In his federal case for stolen boat engines, the loss

amount attributable to Marrero was $11 million.  *Id.* at 31.

## 6. Government Experts.

Sanborn was the Government's maritime expert and testified about general

matters relating to boat thefts on Florida's west coast.  His task force included

more than forty local, state, and federal agencies.  DE240:7-10.  Boats going to

Yucatan typically would be stolen at night and would undergo other modifications

to hide their origin.  *Id*. at 24-26.  Sanborn reviewed Hernandez's travel records to

try and correlate his return trips from Mexico to boat thefts.  *Id*. at 30-31.  The fact

somebody traveled to Mexico by boat and returned to the U.S. by air was not proof

---

[12] Marrero's statement the Tundra with the VIN at issue had been stolen was
false.  DE245:115-16; DE247:188-89.                                    .

a person had taken a stolen boat there. DE240:39. Sanborn investigated boats

thefts from homes or marinas which typically had good security cameras. Yet, in

this case there was no video evidence. He agreed the SI alleged only one of the

four stolen boats had been taken to Mexico. DE240:40-45.

Soto was the Government digital forensic expert who performed the

warrantless Phone search. At this point Hernandez renewed his objection the

Phone evidence should be excluded. DE243:79-80.[13] Soto's testimony provided

evidence the MTS and subsequent objections should have been granted: a) Soto

performed the Phone search in April 2021; b) he used Cellebrite "Premium"

software for that purpose; and c) a previous search already "had been completed

using a different software." DE243:82. Using Cellebrite "Premium" was much

better because Soto "was able to obtain a physical extraction which is a copy of the

memory module from beginning to end." *Id*. at 83. This complete copy of the

Phone's memory allowed the FBI to recover items like WhatsApp data which the

first search could not capture. *Id*. at 84.

On cross-examination, Soto agreed: a) just like a house, to search a cell

phone, a warrant is required; b) the "search" of a cell phone is the running of

extraction software; and c) the "search cannot" be done after expiration of the

---

[13] The Judge said: "Alright. Certainly. And that objection is preserved. It
certainly is preserved." DE243:80.

warrant.  DE243:94-95, 98.  When asked whether a year after a warrant expired another search could be conducted, the Judge sustained the Government's objection that question called for a "legal conclusion."  *Id*. at 99.  On redirect, Soto stated "legal authority" always was required to search a phone.  *Id*. at 104.

Digital forensic expert Ortega testified about his examination of Reyes's phone.  DE243:120-21.  Farlow testified about records his agency maintains, that is, all U.S. inbound/outbound travel.  *Id*. at 126, 128.  When someone leaves the U.S. in a vehicle, there is no inspection.  A freight forwarder is used for the export of a vehicle.  DE243:135-38.  Private vessels leaving the U.S. are not subject to CBP inspection or reporting unless they charge fees to carry passengers or cargo.  *Id*. at 139-140, 147-48, 151.  Goodrich testified about his historical cell site analysis of the Phone.  *Id*. at 164-65; GX-65.  He plotted the general area where the Phone was located at particular times.  *Id*. at 180-82.

### 7. Miscellaneous Prosecution Witnesses.

Regarding the theft of the four boats in the SI, several police officers and others testified as did their owners.  Their testimony did not implicate Hernandez in those thefts. DE242:63-98: DE243:9-56.  Nor did the owners provide facts about the value of their boats.  DE242:63-98; DE243:9-56; DE244:8-20; DE245:45-59.

## 8. Defense Experts.

Pullen was qualified as an expert in Cellebrite cell phone review and analysis, digital forensics in general, and in areas about which Government experts Soto and Ortega had testified. DE246:56, 59-60. The Government objected to, and the Judge agreed, that Pullen would be barred from testifying about certain matters in his expert report ("Pullen Report"). One of those matters was Pullen's comparison of the Phone extractions from the first and second searches, February 27, 2020 and April 6, 2021, respectively. Among other things, Pullen testified: a) after seizure of the Phone, Mexican police did not follow proper procedures to preserve the integrity of its contents; b) 319 events occurred before it was handed over to the FBI, for example, Chrome browser was used to access PayPal and WhatsApp messages were received; and c) using the Phone after seizure changed its data, including possible permanent loss of text messages. DE246:97-98, 101.

Riemer was admitted as an expert for law enforcement and maritime matters. DE247:183, 187. He testified the Tundra associated with the VIN at issue never had been reported stolen. *Id*. at 188-89. Riemer said a search of a Florida law enforcement database revealed that, as of October 9, 2023, the *Luca Brasi,* the fourth boat in count 2, was still listed as "stolen" meaning not yet found. *Id*. at 197. Riemer also testified about discrepancies between photos Spielvogel took of

the *Luca Brasi* during his December 2019 trip to Mexico and photos the boat's owner provided. *Id*. at 201-210; DE248:140-42. The state registration for a pleasure craft was the only document a boat driver needed to have on board when operating in either Florida or international waters. DE248:129-130. Riemer said there was no evidence law enforcement ever contacted Hernandez about boat thefts from Marco Island or Naples after his return from Mexico on December 25, 2019. Nor was there any evidence of any vehicle thefts. DE248:131-33.

### 9. Javier Hernandez.

Hernandez came to the U.S. from Cuba in 2005 with thirty-six others on a boat which landed in the Florida Keys. He was allowed to remain here under existing immigration laws and became a citizen within six years. He held different jobs, including working from 2007-2014 for Avianca Airlines in its Miami airport cargo warehouse. After that he was an Uber and Lyft driver and package deliverer for two companies. He is married and has two children. DE248:144-47. In Cuba he studied engineering and mechanics and learned how to drive boats there and gained more experience living in Miami. *Id*. at 149-51.

In 2017 Gonzalez called him and said their families knew each other from Cuba. DE248:153-56. He asked Hernandez if he would be able to drive a boat from to Mexico. After believing this trip was legal, Hernandez accepted the job.

He left night because it was easier to navigate the more dangerous currents during the day. Gonzalez met Hernandez at a small island near Yucatan and guided him to "Akumal" marina in the Port of Progreso a few hours away. The marina had around fifty boat slips. Its owner, Neco, was responsible for paying Hernandez's $10,000 fee. DE238:157-164. Gonzalez took Hernandez to a restaurant at "La Finca." Hernandez met Neco on his third trip to Progreso, and they discussed Hernandez sending Neco spare parts. *Id*. at 165-75.

The last boat he drove to Mexico was November 18-20, 2019. Shortly after arriving at Akumal the Yucatan police raided the marina and arrested him and Neco. The police physically abused him, and he ended up spending a month in jail. He arrived in Miami at the end of December 2019. From that date until his April 18, 2022 FBI interview, no law enforcement official contacted him. *Id*. at 6, 19-22. Hernandez testified about his interactions with Reyes, Neco, Gonzalez, Crespo, Marrero, and Yisel Castro, his boat trips from Florida to Progreso, and his voluntary April 18, 2022 FBI interview. *Id*. at 23-50.

During cross-examination, the prosecutor grilled Hernandez about his voluntary FBI interview. He admitted telling the two agents that he knew Gonzalez was bringing migrants from Cuba to Mexico, but it was only after he stopped going to Mexico that he heard from others some migrants were held

against their will or suffered abuse if their smuggling debts were not paid. He

resisted the prosecutor's attempts to get him to admit he knew the boats he drove to

Mexico had been stolen. He also denied acting as Neco's "bank."

Hernandez recognized items from his Phone, but he disagreed how witnesses

had characterized them as incriminating. The Tundra never was given to Yucatan

police chief Saiden. Neco's intention was not to bribe Saiden but as a way to deter

Saiden from further threating him.[14] Hernandez denied working with Marrero to

create false documents for boats and vehicles. He also denied driving as many as

twenty boats to Mexico. DE238:50-93; 97-130. He knew Gonzalez and Marrero

were doing illegal things, but that did not mean his own dealings with them were

illegal. *Id*. at 94-95. During redirect examination, Hernandez compared the HIN

in the SI for a stolen Everglades with a HIN of another Everglades in a WhatsApp

message, and they were not the same. *Id*. at 136-39.

## C. Standards of Review.

For Issue I, the standard of review is: a) clear error for findings of fact; and

b) *de novo* for application of the law to those facts. *United States v. Diaz-Lizaraza*,

981 F.2d 1216, 1220 (11th Cir. 1993). For Issue II, the standard of review is a

---

[14] Professor Rosenn, the Government's legal expert, testified about the
difference between bribery and extortion under the Yucatan Criminal Code.
DE245:59-85.          .

question of law subject to *de novo* review. *United States v. Keller*, 916 F.2d 628, 632 (11th Cir. 1990). The evidence is viewed in the light most favorable to the Government with all reasonable inferences and credibility choices made in the government's favor. *Id.* For Issue III, the standard of review is clear error for factual findings and *de novo* for interpretation and application of those facts to the sentencing guidelines. *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014); *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

The Judge erred when she refused to grant the MTS because it was clear under the facts and law the Government performed a warrantless, and thus illegal, search of the Phone. The Government relied on that "fruit of the poisonous tree" as its essential evidence to prove Hernandez's guilt on all counts. The Judge erred when she failed to recognize the Government's evidence against Hernandez was insufficient as to all counts under the Rule 29 standard. The Judge had the benefit of daily copy to assist her in reaching this conclusion when the Government rested its case-in-chief, at the close of all evidence, and post-trial. Finally, the Judge erred when her guideline calculation included aggravating factors not supported by the record. Because the Judge imposed sentence within the advisory imprisonment range, it was six or seven years greater than it should have been.

<u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

I. THE JUDGE ERRED BY DENYING THE MOTION TO TO SUPPRESS THE PHONE EVIDENCE BECAUSE: A) RUNNING EXTRACTION SOFTWARE IS THE "SEARCH"; B) A WARRANT IS REQUIRED TO CONDUCT A PHONE SEARCH; C) THE GOVERNMENT DID NOT OBTAIN A WARRANT TO CONDUCT THE SECOND SEARCH AFTER THE WARRANT EXPIRED; AND D) THE GOVERNMENT DEPENDED ON THE ILLEGAL SEARCH TO PROVE ITS CASE.

<u>A. The MTS And The Pullen Report.</u>

On August 21, 2024, a month before trial, Hernandez filed his MTS the evidence extracted from the Phone and requested an evidentiary hearing.  Pullen would testify about matters to support it.[3]  DE102.[4]  The Pullen Report set forth,

_____

[3] Hernandez asked for the following relief: a) exclusion of evidence extracted from the Phone; b) exclusion of any testimonial or physical evidence related to the Phone; and c) that Government witnesses be instructed not to testify about the Phone's contents.  A hearing was necessary "because the MTS was grounded in highly-technical, digital forensic matters requiring presentation of Mr. Pullen's expert testimony for proper disposition."  DE102:5, 9-10.

[4] Due to confidential information in the Pullen Report [DE109-1], it was filed under seal with copies provided to the Judge and Government.

among other things, that: a) LEOs did not follow essential protocols to prevent tainting, alteration, and loss of Phone evidence; b) there were chain-of-custody issues; and c) the April 7, 2021 second search of the Phone, without a judicial warrant and using different extraction software, copied a vast amount of information not copied during the first February 27, 2020 a year earlier.[5]

Hernandez cited *United States v. Garcia*, 718 F.2d 1528, 1534 (11th Cir. 1983), which held admission of evidence is predicated on a showing the physical exhibit offered is in *substantially the same condition* as when the crime was committed. He argued Pullen would "provide expert testimony the Phone was 'changed in important respects,' requiring, under *Garcia*, *supra*, exclusion of any evidence derived from it. *Id*. at 1534. In its Response the Government raised *three* defenses: a) the Fourth Amendment did not apply to foreign LEOs; 2) the Phone was *searched* pursuant to a *lawful warrant*; and 3) Phone data was reliable and therefore admissible. DE122:1. The Government first searched the Phone on

---

[5] Pullen identified the two distinct extraction programs used as Cellebrite UFED 7.24.0.1 and UFED 7.40.0.85 during those two searches thirteen months apart. The FBI searched the Phone without a warrant using the second software on April 6, 2021. That warrantless search located and recovered a trove of items not capable of capture during the February 27, 2020 search. They included WhatsApp messages, credit cards, Facebook messenger, web history, wireless networks, device users, social media, passwords, *hundreds* more location data files, and *thousands* of deleted messages. *See* DE109-1: 23, 24, 27, 30.

February 27, 2020 pursuant to a warrant.  Thirteen months later, on April 6, 2021, the FBI did a warrantless search of the Phone using different software.  DE122:5-6.

In his Reply [DE124], Hernandez noted the Response did not include analysis or opinions from an expert.  Issue I focuses on the Government's *second defense* in opposition to the MTS: its claim the Phone "was searched pursuant to a lawful search warrant."  DE122:1.  Its other defenses do not matter.  Without lawful authority to search the Phone, it did not matter if: a) LEOs did not follow protocols to preserve the integrity of data; or b) the data was "reliable and therefore admissible."  When the search of property is illegal, it never matters if its fruits are "reliable" because they still cannot be used to prove guilt.

Pullen stated the April 2021 extraction was "not the product of a lawful search warrant," the only valid one having "expired on March 10, 2020."  DE109-1:23-24, 27-28, 30.  Spielvogel agreed the majority of evidence against Hernandez was derived from the Phone.  DE:242:35.  The Government used evidence from the illegal April 2021 search to prove almost its entire case.  The Judge's allowing "fruit of the poisonous tree" to be injected into the trial was harmful error requiring Hernandez's convictions to be set aside.  *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963).

### B. Hernandez Continued To Seek Suppression Of Phone Evidence At Trial.

The Judge did not grant a hearing and, instead, on September 19, 2023, entered an Order denying the MTS. DE136. The devastating impact of her ruling could not be fully appreciated until trial. The Government's Exhibit List included hundreds of items derived from the warrantless Phone search, including WhatsApp chats and audio files. Sixty of those exhibits were admitted at trial. DE184:1-3; GX3-GX17. The Government used those exhibits with key witnesses, Spielvogel, Reyes, Marrero, and Francisco. Had those Phone exhibits been excluded, the Government would have been forced to try and prove its case with questionable "he said-she said" testimony and unconvincing physical evidence.

At trial Hernandez carefully preserved the MTS record. On day 5, he filed a motion for reconsideration ("MFR"), the Government responded, he replied, the Judge denying the MFR by paperless Order without explanation. DE157; DE159; DE160; DE163. The Judge did grant a "continuing objection" to admission of Phone evidence. DE247:17, 21; *see also* DE243:79-80. In his MFR, Hernandez argued the Government never challenged Pullen's findings about the March 10, 2020 warrant expiration and April 6, 2021 warrantless search when it copied a treasure trove of data not copied during the first search a year before. DE160:2-5.

Spielvogel's testimony showed the MTS would have been granted had the Judge held a pretrial hearing.  DE157:2-3.  Pullen would have testified the "search" of the Phone was "running" extraction software.  Spielvogel agreed a warrant was required to perform the second search, and the warrant had expired March 10, 2020.[6]  In the MFR the defense argued, if the Government were allowed to search private property after a warrant expired, it could search property *forever* whenever it acquired better technology.  DE157:4.  Without legal support, the Government maintained running extraction software was exempt from warrant expiration.  If that were true, the Government had to provide legal authority to make it part of the record, but no such authority exists in this record on appeal.

 C. Legal Authorities Required Suppression Of The Warrantless Search.

In its Response to the MFR, the Government stated "appropriate grounds for granting reconsideration..." included "(1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or manifest injustice."  DE159:2.  The Government simply ignored the fact the last two grounds existed.  The new evidence was Spielvogel's testimony where: a) he

---

[6] On redirect the Government tried to rehabilitate Spielvogel by asking him if the warrant had language allowing a warrantless search thirteen months after it expired.  He reviewed the warrant while on the stand, but he never read into the record such "authorization language."  Nor did the prosecutor introduce such language into evidence.  DE242:24-44.  Nothing in the record shows the April 6, 2021 Phone search was legal.

agreed a warrant was necessary to search the Phone; b) experts said the "search" of a phone was running extraction software; c) more than a year after the warrant expired the FBI did another Phone search using different software without a new warrant; d) he thought the warrant allowed for a second search of the Phone even after it had expired; and e) although he thought warrant language permitted a subsequent search, Spielvogel never identified that language for the record. The Judge ignored binding precedent the defense cited in the Reply. DE160; *Riley v. California*, 573 U.S. 373 (2014). *Riley* established a new rule requiring the Government to obtain a warrant before it can search a cell phone.

In *Riley*, *supra*, the Supreme Court stated: "Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally *required* before such a search, even when a cell phone is seized incident to arrest." The Court explained "[o]ur cases have historically recognized that the warrant requirement is 'an important working part of our machinery of government,' not merely 'an *inconvenience* to be somehow 'weighed' against the *claims of police efficiency*.'" *Id*. at 401 (citations omitted) (emphasis supplied). Here, for "convenience," the Government created its own exception to *Riley'*s warrant requirement out of thin air. *See United States v.*

*Watson*, 2024 WL 3860113 *9-10 (11th Cir. 8/19/2024)(citing *Riley*, *supra*, at 401)(police may seize phone at arrest but cannot search it without a valid warrant).

No amount of tortured reasoning can extricate the Government from its predicament. *Riley v. California*, 537 U.S. 373 (2014), was the law of the land. The warrant required to search a cell phone cannot expire yet still be valid. The only issue then is whether running extraction software after a warrant expires is a new "search." The Government's digital forensic expert, Soto, testified it was and, therefore, a new warrant had to authorize the April 6, 2021 extraction. DE243: 94-95, 97-98, 104. During Soto's testimony Hernandez again renewed his objection to the admission of Phone evidence.[7] Soto received the Phone itself [GX3] and performed the April 6, 2021 extraction search. *Id*. at 78; GX3; GX4. He noted that one search "already had been completed using a different software." *Id*. at 82. Ironically, Soto's testimony provided the reasons why the MTS, the MFR, and Hernandez's continuing objections to the Phone evidence should have benn granted. Soto testified: a) searching a cell phone, like a house, requires a warrant; b) the "search" of a phone is the running of extraction software; c) the "search" must be performed before the warrant expires; and d) "legal authority" always is needed to search a cell phone. *Id*. at 94-95, 97-98, 104.

---

[7] The Judge said: "Alright. Certainly. And that objection is preserved. It certainly is preserved." DE243:79-80.                    .

D. The Judge Erred By Not Granting Suppression Of The Phone

Evidence Once Clear Justification For It Came To Light.

In her denial of the MTS the Judge stated: "Hernandez has not shown that the February 2020 warrant had 'expired' in the sense that the Government acted beyond the warrant's scope by performing the second extraction; nor has he provided legal authority supporting that a subsequent search of a phone obtained pursuant to a lawfully executed warrant is an unreasonable search or seizure." DE136:11. Had she held a hearing, Pullen would have testified a valid warrant was required to run another extraction using different software if the first one expired thirteen months before. The second extraction was a completely new "search" of the Phone's contents. After the trial testimony of Soto and Spielvogel the Judge failed to recognize that suppression was required under undisputed facts and applicable law. DE243:82-85, 94-95, 98; 104; DE242:28, 30-32.

After Spielvogel's testimony, Hernandez filed the MFR relying on *Riley v. California*, 537 U.S. 373 (2014), to show the Judge harmful error was infecting the trial: admission of the illegally-obtained Phone evidence for the Government to prove its case. Fed. R. Crim. P. 41(e)(2)(A)(B) provides, in pertinent part:

(e) Issuing the Warrant...
　(2) Contents of the Warrant...
　　(A) the warrant must identify the person or property to be searched, identify any person or property to be seized...

    (i) *execute* the warrant within a specified time *no longer than 14 days*...

  (B)...A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media *or* the seizure *or* copying of electronically stored information. Unless otherwise specified, the warrant *authorizes a later review* of the media or information consistent with the warrant. The *time* for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure *or* on-site *copying of the media or information*, and *not to any later off-site copying or review*.

(emphasis supplied).

The undisputed material facts showing the Judge committed harmful error are: a) the February 27, 2020 search ("Search I") had a warrant which expired March 10, 2020; b) Search I used extraction software "A" and was executed on February 27, 2020; c) the April 6, 2021 search ("Search II") did not have a warrant; d) Search II used extraction software "B" executed on April 6, 2021; e) running extraction software is the "search" of a cell phone; f) Search II copied an enormous amount of data not copied during Search I; g) at trial the Government sought admission only of Search II evidence; and h) because there was no warrant nor exception to the warrant requirement for Search II, all evidence it obtained was "fruit of the poisonous tree" and had to be excluded from trial. DE243: 94-95, 97-98, 104; *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963). The Government never introduced the search warrant into evidence, nor did any

witness identify language in it authorizing a new Phone search thirteen months after its March 10, 2020 expiration date.[8]

Few authorities address these issues, but all appear to be in accord on some fundamental matters. Under Rule 41(e)(2)(B), a search warrant can be "executed" either when a cell phone is "seized" or "brought within the Government's control, rather than when the information is analyzed by the the government." The "time for executing the warrant...refers to the seizure or onsite copying of the media or information, and not to any other off-site copying or review." *See United States v. Carrington*, 700 F. App'x 224, 232 (4th Cir. 2017) (citations omitted). In Hernandez's case, the FBI already had seized the Phone when Mexican police handed it over to Spielvogel in December 2019. Thus, the relevant provision of Rule 41 is when the "media or information" was "copied." The warrant was issued on February 26, 2020 with expiration March 10, 2020. Pursuant to that warrant, the FBI "copied" the Phone's contents using software "A" on February 27, 2020, that is, within the permitted "execution" deadline. That "copy" was the information it pulled out of the Phone on February 27, 2020 and put in a "storage box." The Government did not have to "review" the contents of the box before the March 10, 2020 warrant expiration, as provided for in the Rule. However, as recapped below, that is not what happened here.

---

[8] The Government tried to locate such language in the warrant. If it did exist, it never became part of the record. DE242:43-44.

Thirteen months after the warrant expired, without securing a new one, the Government gave the Phone to Soto. He ran Software "B" which, we know from Soto, was a brand new "search." DE243:78, 94-95, 98, 104. This new warrantless search copied a mountain of new data: WhatsApp texts and additional messages between Hernandez and others, as well as other data not found using Software "A." At trial the Government utilized the information copied in Search II as its essential proof against Hernandez. This issue may appear somewhat confusing under Rule 41(e)(2)(B), but it involves a simple two-step process: a) the Government could copy the Phone's digital medium prior to the warrant's expiration on March 10, 2020; and b) after that date, the Government could review and analyze that material copied during the February 27, 2020 search. *See, e.g., United States v. Cleveland*, 907 F.3d 423, 430 (6th Cir. 2018).

This two-step process can be analogized: a) on February 26, 2020, a librarian gives Doe a key to a small library; b) Doe is allowed to copy books he finds for up to fourteen days; c) the key comes with instructions: "after March 10, 2020, you cannot copy any more books you may find in the library without prior permission"; d) on February 27, 2020, Doe copies all the books he finds; e) on April 6, 2021, without permission, Doe gains entry to the library; f) he discovers more books and copies them. When Does tries to defend his second entry and

copying of more books, he claims: a) he didn't discover the additional books the first time; and) he thought the instructions allowed him to return and copy whatever books he might find.  The librarian asks Doe to identify language in the instructions supporting his defense, but Doe is unable to do so.  Can Doe keep copies of the books from his second visit?  No, because he made them without permission.  But after March 10, 2020 can Doe look at his first set of copies?  Yes, but that's a completely different issue.

Here, at trial, the Government used copies of data made on April 6, 2021 without legal authorization.  A judge never authorized the Government's April 6, 2021 "return to the Phone to make more copies."  *See, e.g., United States v. Whipple,* 92 F.4th 605, 614 (6th Cir. 2024); *United States v. Cleveland*, 907 F.3d 423, 430 (6th Cir. 2018).  Because the Government presented its core case using evidence derived from the illegal April 6, 2021 Phone search, the Judge's refusal to exclude it at trial was harmful error of constitutional magnitude.  Hernandez respectfully requests this Honorable Court correct that harmful error by reversing his convictions under each of the SI's five counts.  *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963).

## II. THE JUDGE ERRED BY DENYING HERNANDEZ'S RULE 29 MOTIONS BECAUSE THE GOVERNMENT DID NOT MEET ITS BURDEN OF PROOF TO SUSTAIN CONVICTIONS FOR ANY OF THE FIVE COUNTS.

### A. Preservation Of Insufficiency Of The Evidence Error.

To prove each of the SI's five counts, the Government relied almost exclusively on Phone evidence. *See*, *e.g.*, DE242:35; DE184:1-3. In Issue I, Hernandez showed that evidence was the product of an illegal search requiring its exclusion from trial. The Judge also erred by failing to recognize the Government did not satisfy its burden of proof as to each count. Hernandez preserved this second error when the Government rested its case-in-chief, at the close of all evidence, and in a post-trial motion ("PTR29"). DE247:169; DE238:144-48; DE196:1-9; DE201:1-10.

### B. Count 1 - 8 U.S.C. §1324(a)(1)(A)(v)(I)(Alien Smuggling Conspiracy).

To prove this conspiracy crime the Government had to present competent, substantial evidence Hernandez agreed with others to encourage or induce aliens to enter the United States without prior permission and for commercial gain. The Government had two theories to try and prove he joined the conspiracy: a) he delivered boats to the GV HSO which it then sold and used the proceeds to finance

its operations; or b) the GV HSO utilized those boats to smuggle migrants from Cuba to Mexico.  Assuming *arguendo* there was evidence Reyes and Hernandez stole the four boats in count 2, or even others, and Hernandez drove them to Mexico, those facts are insufficient.  The Government did not present evidence those boats supported either of those two theories. The boats could have been used for another purpose unrelated to count 1.[9]  *See* ECF No. 185:10-12 (count 1 jury instruction).  Even Reyes's testimony did not include proof supporting Hernandez's guilt.[10]  In sum, no witness supplied material facts essential to support Hernandez's guilt beyond a reasonable doubt.[11]

    Hernandez's conviction under a direct theory of guilt, or even one of "aiding and abetting," cannot be sustained due to lack of competent, substantial evidence.

---

[9] Crespo testified that Hernandez drove 10-12 boats to Mexico.  Those boats would be for personal use, sold, or given as gifts.  DE242:132, 134-35.  Crespo never said those *particular* boats were used to smuggle migrants or to finance smuggling operations.  To conclude otherwise would be to  speculate rather than point to portions of the record with proof beyond a reasonable doubt.

[10] Reyes did not know what crimes Gonzalez and his co-conspirators committed except for selling stolen boats.  DE:244:136-37.  He said  Neco painted the boats Hernandez took to Mexico and then looked for buyers. DE245:25.  Reyes never stated any of the boats Hernandez drove there were used to further any object of the count 1 conspiracy.

[11] The evidence Hernandez presented in his defense case, including his own testimony, cannot salvage the lack of sufficient evidence when the Government rested.  *See United States v. Moore*, 504 F.3d 1345, 1348 (11th Cir. 2007).

Moreover, evidence Hernandez presented in his defense case, including his own testimony, cannot rescue the Government from the lack of sufficient evidence by the time it rested. In *United States v. Moore*, 504 F.3d 1345 (11th Cir. 2007), the Eleventh Circuit held Rule 29 entitles a defendant "to a snapshot of the evidence *at the point* that the court reserves its ruling, frees the defendant to present *additional* evidence *without fear* of doing himself *harm* on the sufficiency issue. That freedom is made possible by the assurance that appellate review, as well as the district court's own consideration, is *limited* to the evidence in the government's case in chief." *Id*. at 1348 (emphasis supplied).

The Government used Spielvogel's April 18, 2022 Hernandez interview without counsel to try and prove facts supporting each count. DE241:9-153; DE242:5-56. A detailed review of Spielvogel's testimony shows he did not accomplish that objective although he tried very hard to do so. During the interview, Spielvogel showed Hernandez a PowerPoint presentation [GX108] with WhatsApp messages and images from the warrantless Phone search, including exchanges between him and Reyes and Neco. He told Hernandez this information implicated him in the transport of stolen boats to Mexico. *Id*. at 59-67. Hernandez did not deny he drove boats and cars from Florida to Mexico for Neco and others. DE241:75. However, he denied being part of the GV HSO. Hernandez admitted delivering boats and spare parts to Neco. He knew Gonzalez was in the migrant

smuggling business and Gonzalez got boats from Neco for that purpose.

Hernandez admitted visiting "La Finca" but denied having personal knowledge

migrants were being threatened and abused.  DE241:95-97, 112-13. Assuming

*arguendo* Spielvogel accurately recounted what Hernandez said during the April

18, 2022 interview, those admissions only show that Hernandez learned then or

later about crimes others were committing.  It is fundamental that such admissions

are not sufficient to prove guilt beyond a reasonable doubt.  *See* 185:12, 14, 18

(Jury Instr. counts 1, 2, 3, 5):

> But simply being present at the scene of an event or merely associating with
> certain people and discussing common goals and interests does not establish
> proof of conspiracy. Also, a person who does not know about a conspiracy
> but happens to act in a way that advances some purpose of one does not
> automatically become a conspirator.

Spielvogel told the jury what Hernandez purportedly said during the April 18, 2022

interview without corroboration because the interview was not recorded.

Regardless, he never said Hernandez admitted guilt for any crime.  DE241:142,

143, 147, 148.  With rough-draft transcripts the Judge had opportunities to find the

evidence insufficient: a) at the close of Government's case-in-chief; b) at the close

of all evidence[12]; and c) when considering the PTR29 [DE196],  The Judge failed

to do so at each of these junctures resulting in harmful error requiring Hernandez's

---

[12] The Government did not present a rebuttal case.  DE238:142.

five convictions be set aside.

Count 2 - 18 U.S.C. §371 (Conspiracy To Transport Stolen Vessels).

A judgment of acquittal was required because Reyes's testimony that Hernandez stole the four boats was not competent, substantial evidence. Although Hernandez took the stand and denied stealing boats, or knowing they were stolen, the Judge was obligated to consider only the state of the evidence when the Government rested its case-in-chief. *United States v. Moore*, 504 F.3d 1345, 1348 (11th Cir. 2007); DE247:169-170. Moreover, after the close of all evidence, the Government still had not introduced lawful, competent, and substantial proof showing Hernandez stole any boats or knowingly transported them.

In *United States v. Gonzalez*, 183 F.3d 1315, 1325 (11th Cir. 1999), when a defendant denies guilt, the jury can use that denial as positive proof against him. However, the Government still must adduce competent, and substantial evidence proving the defendant's guilt beyond a reasonable doubt. Here, the Government will argue there was "other evidence" satisfying its burden. However, that "other evidence" was derived from the illegal Phone search and cannot be considered when making a sufficiency determination. Reyes's testimony that Hernandez stole boats or knew they were stolen was not competent substantial evidence of the count 2 conspiracy. *See*, *e.g.,* DE244:53-54, 56-59.

*United States v. Jenkins*, 779 F.2d 606, 615-16 (11th Cir. 1986), is instructive because the same legal test applies here. To sustain a conviction, the Government must prove beyond a reasonable doubt a conspiracy existed, the defendant knew of it, and he voluntarily joined in it. With regard to intent, it must prove beyond a reasonable doubt the defendant had a *deliberate, knowing, and specific intent to join the conspiracy*. Finally, although circumstantial evidence may be used to prove a conspiracy, *more than mere presence at the scene of the crime* must be shown. *United States v. Jenkins*, 779 F.2d 606, 609 (11th Cir. 1986)(emphasis supplied).

A detailed review of Spielvogel testimony *never* showed Hernandez "confessed" to committing any crime. DE241:59-95. Hernandez admitted to "piloting" boats, taking return flights to the U.S. from Mexico, and driving vessels and vehicles to Mexico for Neco and others. Even if accurate, those admissions themselves do not prove Hernandez's guilt. The SI does not allege Hernandez transported the first three boats in count 2 but rather only the fourth one. *See* DE51:5-6. Just as the Eleventh Circuit held in *United States v. Kelly*, 888 F.2d 732, 741 (11th Cir. 1989), the Government's proof against Hernandez "supports little more than speculation and conjecture" regarding the theft and transport of the boats at issue, the same being true for the SI's other four counts.

A careful reading of Spielvogel's testimony does not show Hernandez being involved in bribing any Mexican officials. Rather, Hernandez was paid $2,000-3,000 to drive a used Tundra from Florida to Neco in Mexico. What others did with that Tundra did not involve Hernandez. The Government seeks refuge in conduct the law does not accept to prove guilt. *See* DE241:88-92; DE185:12, 14, 18 (Jury Instr. counts 1, 2, 3, 5). This Court firmly has established that, to prove a conspiracy crime, the Government cannot present just evidence beyond a reasonable doubt. Rather, that evidence *must be substantial. United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989). Here it was not.

Counts 3, 4 - 18 U.S.C. §371, 18 U.S.C. §2321

(Motor Vehicle Conspiracy and Substantive Crimes)

The Government presented material evidence about only one motor vehicle, the Tundra.[13] However, under 18 U.S.C. §2321, for Hernandez to be convicted of the count 3 conspiracy and the count 4 substantive crimes, the Government had to prove the essential element beyond a reasonable doubt that Hernandez "was aware of the unlawful removal, obliteration, tampering with, or alteration" of the vehicle

---

[13] Marrero mentioned brands of other vehicles but had no information to prove the crimes in counts 3 and 4. He claimed those other vehicles were stolen, but there was no proof. He stated Hernandez drove vehicles to Mexico for Neco and Gonzalez but never provided evidence those allegedly stolen vehicles involved VIN crimes under 18 U.S.C. §2321. Even if those other vehicles were stolen, the mere fact they were driven to Mexico would not constitute a count 3 or 4 crime.

identification number ("VIN").  Whatever evidence the Government adduced for

count 3 and 4, under *United States v. Moore*, 504 F.3d 1345 (11ᵗʰ Cir. 2007), the

Judge only could consider the "snapshot" of that evidence when it rested its case-

in-chief.

Marrero was the only witness who testified from personal knowledge about

any "tampering" or "altering" of VINs.  His testimony did not provide competent,

substantial proof Hernandez "was aware of the unlawful removal, obliteration,

tampering with, or alteration" of any VINs.  Marrero's testimony showed: a) he

created false VINs and HINs (hull identification numbers) for others; b) Marrero

sometimes installed them himself; c) Marrero sent false VINs and HINs directly to

Mexico; d) Hernandez drove vehicles to Mexico for Neco and Gonzalez; and e)

Marrero never said Hernandez knew any of those vehicles had VINs that had been

"removed, obliterated, tampered with, or altered."  Without evidence Hernandez

had such knowledge, an essential element of counts 3 and 4, his convictions cannot

be sustained.  *See* DE245:103-122; DE246:8-43.[14]

---

[14] Hernandez told Spielvogel that Marrero was a person who created fake
HINs for the GV HSO.  DE241:108-09.  However, the fact Hernandez knew
Marrero was be involved in such conduct is *not* proof that incriminates Hernandez
in counts 3 and 4 or in the other three counts.  Moreover, whether Marrero made
false HINs is irrelevant to counts 3 and 4 which relate only to motor vehicles.
DE51:8-11.

<u>Count 5 - 18 U.S.C. §1956(h) (Money Laundering Conspiracy)</u>

As to count 5, 18 U.S.C. §1956(h), there was no competent substantial evidence showing Hernandez participated in this crime. The instruction the Court gave the jury describes a violation of §1956(a)(2)(A) as being when an individual knowingly transports, transmits, or transfers a monetary instrument or money to a place in the U.S. from or through a place outside it. However, two key portions of it provide: "with the intent to promote the carrying of specified unlawful activity" means the individual must have conducted the financial transaction to make it easier or help to bring about the "specified unlawful activity." The specified unlawful activities were transportation of stolen vessels; trafficking in motor vehicles with altered VINs; and bribery of Mexican officials.

The evidence did not satisfy the elements of this instruction. DE185:15-18. Both the testimonial and physical evidence fails to show Hernandez "conducted the *financial transactions* for the purpose of making easier or helping to bring about the 'specified unlawful activity.'" Assuming *arguendo* there was evidence Hernandez stole boats and drove them and vehicles to Mexico, he was not "conducting financial transactions" destined for the United States from or through a place outside the United States. Therefore, as a threshold matter, Hernandez's conviction under count 5 for money laundering conspiracy must be vacated.

In its Response to the PTR29, the Government argued there was evidence to support a conviction because: Crespo and Reyes "testified regarding the transfer and transportation of money between Mexico and the [U.S.] for the purposes of promoting the enterprise's illegal activities, including the bribery of foreign officials and transportation of stolen vessels." The Government also relied on GX97, Western Union records, between Hernandez and Crespo and Gonzalez, and GX33, Gonzalez "screenshots" of transactions between him and Hernandez. DE198-9-10. Yet, no Government witness testified what those "transactions" meant. There was zero evidence Western Union records or "screenshots" had anything to do with any crimes.

If the Government could prove its case by sheer number of witnesses and quantity of physical evidence, it might be able to defend against this sufficiency challenge. In the final analysis, however, this did not matter, the only thing that did: whether there was sufficient evidence beyond a reasonable doubt to prove each element of the five counts. There was not. The Judge erred by failing to grant Hernandez a judgment of acquittal as to all counts.

ISSUE III. THE JUDGE ERRED WHEN SHE DENIED THE

OBJECTIONS TO GUIDELINES AGGRAVATING FACTORS

RESULTING IN AN ERRONEOUS TOTAL OFFENSE LEVEL.

## A. First Sentencing Hearing.

On February 2, 2024, the Judge held a sentencing hearing.  DE250:1-72.

Neither party called witnesses to support or oppose objections.  After reviewing

pertinent filings and hearing argument, she ruled the Total Offense Level ("TOL")

was 29, advisory imprisonment range 87-108 months.  Hernandez did not agree

with that TOL.  DE250:67, 69.  The Judge used the January 26, 2024 revised PSR

[DE219] and Addendum [DE219-1] (collectively "PSR") and relied on Count

Group 1 for the TOL.  *Id*. at 69.  The USPO recited: BOL 24, two-level increase

for 18 U.S.C. §1956(h), two-level increase for special skill, one-level increase for

"multiple count adjustment."  DE219:16.  Hernandez's filings were lengthy to

ensure preservation of his Objections.  DE208:1-9 (Objections original PSR);

DE214:1-29 (Sentencing Memorandum); DE222:1-37 (Objections PSR).

## B. Objections To Factual Matters.

The PSR contains six pages of factual matters.  PSR at pp. 6-12, pars. 7-31.

Hernandez disputed many in his Objections.  *See* DE222:4-7 ("Objections").  Due

to size limitations, he cannot repeat them here.[15]  Hernandez objected to PSR par.

29, "Role Assessment."  There was no evidence Hernandez and Reyes boats were

used to transport migrants.  Moreover, the PSR erroneously claimed Hernandez

gave money to foreign public officials but no such facts exist.  The loss "for

laundered funds," $1.5-3.5 million had no "reliable and specific proof" as required

under *United States v. Lawrence*, 47 F.3d 1557, 1566 (11th Cir. 1995).

### C. The Judge Erred In Her Count Group 1 Calculation.

As a first matter, a two-level decrease under §4C1.1 should have been given

in PSR par. 61.  The USPO agreed to that decrease in the original PSR.  *See*

DE204: 15 (par. 57).  The USPO removed that reduction because the Judge found

Hernandez was subject to §2L1.1(b)(6), a disqualifying criterion.  Yet, there was

no evidence Hernandez merited that enhancement, relevant only to Count Group 2

(count 1).  The §4C1.1. two-level decrease, as originally afforded, should be given

again.  In the PSR, the USPO *radically* increased the TOL, *tripling* the advisory

imprisonment range from 78-97 months to 210-262 months, based *solely* on the

USPO's *blanket acceptance* of the Government's own objections to the PSR [ECF

No. 212].  The USPO offered no facts or authorities justifying that huge increase

whereas Hernandez's extensive Sentencing Memorandum [ECF No. 214:1-29]

---

[15] In Issue III, Hernandez does not discuss Objections the Judge granted.

countered the Government's objections.

### D. Loss Amount, *United States v. Dupree*, And Other Authorities.

In the PSR, par. 39, the loss amount is $1.5-$3.5 million, a 16- level increase under §2B.1.1(b)(1)(I). Hernandez objected to that amount before because there were no "reliable and specific" facts supporting it. *See* DE208:15, 16. *United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023). By filing Objections to the original PSR, a Sentencing Memorandum, and Objections to the PSR, Hernandez demonstrated a 16-level increase for a loss amount of $1.5-$3.5 million was harmful error under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023), *United States v. Banks*, 55 F.4th 246, 257 (3rd Cir. 2022), and other authorities; *see also United States v. Bautista-Villareal*, 2023 WL 4363995 at *4 (11th Cir. July 6, 2023) (sentence vacated where court plainly erred under *Dupree*). The unambiguous meaning of "loss" is "actual loss," and the alternative "intended loss" only can be applied by deferring to a guidelines Commentary Application Note, now prohibited by this Circuit's binding precedent.

### E. Computation Of Offense Level Under Count Group One.

In paragraph 40 of the PSR, the USPO calculated a BOL of 26 based upon an initial BOL of 6 and 20-levels increase. Hernandez's Objections to it should have been sustained under *United States v. Lawrence*, 47 F.3 1559, 1566 (11th Cir.

1995).  The USPO added two levels because Hernandez "was convicted under 18 U.S.C. §1956(h)... §2S1.1(b)(2)(B)."  He filed the PTR29 regarding all counts which the Judge denied.  However, even taking into account a two-level increase under §2S1.1(b)(2)(B), his TOL would be 8.  The two levels for special skill did not have factual or legal support.

## F. The Judge Erred In Her Loss Amount Calculation.

Without a stipulation between the parties, a court cannot accept the Government's factual assertions to increase a defendant's TOL.  A prosecutor's factual proffer is not evidence a court can use for an enhancement.  *See*, *e.g.*, *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013).  In *United States v. Rodriguez*, 732 F.3d 1299 (11th Cir. 2013), this Circuit held the district court *clearly erred* when it added an enhancement for more than 50 victims.  The judge had relied on a summary chart the Government presented at sentencing.  There were no witnesses to authenticate it nor to provide facts how it was made.  Nor did the Government provide proof linking the chart to the trial evidence.  The *Rodriguez* Court relied on *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013), which held Government representations were insufficient to prove "more than 250 victims."  The *Rodriguez* Court also relied on *United States v. Lawrence*, 47 F.3d 1559, 1568 (11th Cir. 1995), which held "perfunctory

summaries of the evidence that the Government stood ready to present" were not reliable and specific evidence. *See United States v. Rodriguez*, 732 F.3d 1299, 1305 (11ᵗʰ Cir. 2013). The foregoing *Rodriguez* scenario was exactly what happened at Hernandez's sentencing.

The Judge asked about the $1.5-$3.5 million loss amount, defense counsel said it was disputed because there was no trial evidence to support it, citing *United States v. Lawrence*, 47 F.3d 1559, 1568 (11th Cir. 1995). At the hearing the Government gave defense counsel documents to support its loss figure. Hernandez also was relying on *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023), which required using the loss guideline's precise language: "loss" had to be a victim's actual loss. The Government argued insurance companies were "victims" too because they had to make the boat owners whole. DE250:18-21. The Judge asked the prosecutor to state the number of stolen boats, stolen vehicles, and actual loss to victims. DE250:21. In response, he made a proffer about boats and vehicles taken to Mexico, but it lacked detail clearly falling short of "reliable and specific" evodemce required by *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995). DE250:21-24. The Judge said those documents showed insurance companies paid owners' claims on three boats for $120,000, $130,000, and $305,000. DE250:27.

The Judge thought Hernandez was willing "to accept the proffer," but in response defense counsel said: "No. I said I agree that that would be the proffer of the agent, not that I agree with it." *Id*. After that the prosecutor never had the agent testify about those insurance documents, nor did the Government seek to have them admitted and become part of the record. Hernandez disputed including a $200,000 proffered loss amount for a Grady-White boat because there was no evidence Hernandez was involved in its theft, or that he even knew about the theft. *Id*. at 28-29.

G. The Judge Erred By Imposing An Enhancement Under §2L1.1(b)(6).

Crespo never stated any boats Hernandez drove to Mexico were used to smuggle migrants. He did say sometimes those boats were sold, but he never stated the proceeds were used to finance GV HSO operations. Regardless, under *United States v. Lawrence*, 47 F.3d 1559, 1566-67 (11th Cir. 1995), to be able to assign Hernandez a two-level increase under §2L1.1(b)(6), for "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another," the evidence had to be "reliable and specific." First, neither Crespo, Reyes, Spielvogel, Marrero nor any other witness gave evidence Hernandez was involved in such conduct. Second, no physical evidence corroborated such conduct. The "Finca" was *not* a location where any migrants were abused, and whether

Hernandez visited that location has no bearing on this aggravating factor.

## H. The "Special Skill" Enhancement Does Not Apply.

The Government sought a two-point increase for use of a special skill under §3B1.3. It asserted Hernandez needed "special skill" to drive boats from Florida to Mexico. That guideline states: "If the defendant...used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." Therefore, driving boats from Florida to Yucatan had to "significantly facilitate" the crimes for this factor to apply. Yet, using things like GPS and weather apps does not demonstrate a "special skill." Those devices commonly are used by pleasure craft owners who take their boats from Florida to other countries like Mexico and the Bahamas. This is why the USPO did not include this enhancement in the TOL for Group Count Two. *See* DE219:15-16. A GPS or navigation app used by the general boating public is not proof of a special skill. Hernandez drove boats to Mexico by himself so he was not serving as a "captain" for others. Also, estimating fuel requirements does not demonstrate possession of any "special skill." The USPO's original conclusion that a special skill increase was not appropriate was correct.

## I. Correct TOL For Count Group 1.

Hernandez has demonstrated the Judge erred when she fixed the BOL at 24

and the TOL at 29. He challenged $1.5-$3.5 million loss amount which obligated the Government to prove that figure with "reliable and specific" evidence. *United States v. Lawrence*, 47 F.3d 1557, 1566 (11th Cir. 1995). Because it did not, nor prove any other loss amount under that standard, the BOL was 6. In Issue II, Hernandez showed why his count 5 conviction for 18 U.S.C. §1956(h) should be vacated. Assuming *arguendo* this Court denies that relief, two levels would be added to the BOL. As to the final two levels for "special skill," Hernandez has argued it should not apply. Accordingly, the Court should find the Judge erred and make a determination whether the TOL should be corrected to 6, 8, or 10.

## CONCLUSION

It respectfully is prayed this Honorable Court grant Hernandez the following relief: a) vacate his convictions and sentence in counts 1-5 because the Judge allowed the Government to introduce at trial its essential evidence derived from the illegal search of the Phone; b) vacate his convictions and sentence in counts 1-5 due to insufficient evidence; and c) alternatively, vacate his sentence for counts 1-5 because the Judge calculated his guidelines incorrectly resulting in an advisory imprisonment range six or seven years greater than it should have been; he also respectfully asks the Court that, pursuant to *United States v. Washington*, 714 F.3d

1358, 1361 (11th Cir. 2013), the Government not be permitted to introduce at a

resentencing new evidence in support of any enhancements it seeks.

Respectfully submitted,

/ s / Martin A. Feigenbaum
Florida Bar No. 705144
P.O. Box 545960
Surfside, Florida 33154
Telephone: (305) 323-4595
Facsimile: (844) 274-0862
Email: innering@aol.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY a true and correct copy of this initial brief was furnished electronically via the CM/ECF system this 17th day of September, 2024, to all persons entitled to such notice.

/ s / Martin A. Feigenbaum

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

The undersigned certifies this initial brief has 12,996 words as calculated by the Properties feature of the Wordperfect word processing program and, therefore, is in compliance with the type-volume limitation requirements of the above Rule.

/ s / Martin A. Feigenbaum

## **CERTIFICATE OF COMPLIANCE WITH ELECTRONIC FILING**

The undersigned certifies this initial brief has been filed electronically this 17th day of September, 2024, in compliance with 11th Cir. R. 31-5.

/ s / Martin A. Feigenbaum